**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

                                           Crim. No. 1:06-cr-00076-NLH-2

    v.                                **OPINION**

AHMED JUDGED

**APPEARANCES**:

ANDREW D'AVERSA
DOJ-USAO
970 BROAD STREET, 4TH FLOOR
NEWARK, NJ 07102

DIANA V. CARRIG
OFFICE OF THE US ATTORNEY
US POST OFFICE BUILDING
401 MARKET STREET, 4TH FLOOR
CAMDEN, NJ 08101

    *Attorneys for United States of America*

JULIE A. MCGRAIN
FEDERAL PUBLIC DEFENDER'S OFFICE
800 - 840 COOPER STREET, SUITE 350
CAMDEN, NJ 08102

    *Attorney for Ahmed Judge*

**HILLMAN**, District Judge

    Before the Court is Ahmed Judge's ("Judge" or "Defendant")

Motion for Reduction of Sentence under § 404(b) of the First

Step Act and Supplemental Motion for Reduction of Sentence.

(ECF 436, 448).  For the reasons that follow, the Motions will

be denied.

1

I.  **Background**

On March 7, 2008, Defendant was found guilty by a jury of Count One: Conspiracy to Distribute and Possession with Intent to Distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base in violation of 21 U.S.C. § 846 and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)); Count Two: Murder in Furtherance of a Drug Trafficking Conspiracy in violation of 21 U.S.C. § 848(e)(1)(A); Count Three: Murder in the Course of a Firearms Offense in violation of 18 U.S.C. §§ 924(c)(1) and 924(j); and Count Four: Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g).  (ECF 281, 282).

The uncontested findings of the Presentence Investigation Report ("PSR") (ECF 498-2) established Defendant's role in the drug trafficking organization:

> Ahmed Judge, although also a low-level drug dealer, was primarily an "enforcer" for [co-defendant] Jevon Lewis.  Ahmed Judge had attempted to run his own drug sets, and used Jamar Bacon to do so, however, the attempts were unsuccessful.  It is noted that Ahmed Judge was involved in the Jevon Lewis [Drug Trafficking] Organization ["Lewis DTO"] and overall conspiracy for the shortest time of all the defendants.  Specifically, Judge was incarcerated from in the 1990's until 2000, and did not join the conspiracy until approximately June 2001.  In September 2001, Ahmed Judge traveled to Florida and remained in Florida until October 2001.  On October 4, 2001, Ahmed Judge and Jamar Bacon killed Kenneth Fussell. Judge fled to Florida for a short time in October 2001, and then was apprehended on November 3, 2001 and charged

2

> by the Camden County Prosecutor's Office
> with the murder of Kenneth Fussell.

(PSR at ¶ 45).

The PSR also described the murder that formed the basis for Counts Two and Three and Defendant's role in it:

> Testimony at trial revealed that Ray Morales [the leader of a larger Drug Trafficking Organization that supplied drugs to the Lewis DTO] used violence, including the murders of other people, to deal with his competition, customers who owed him money, and others. In particular, on September 8, 2001, a person shot and killed Jorge Morales, a worker at the Morales Organization's drug market at Atlantic and Norris Streets. Because Ray Morales believed that violence at an open air drug market was bad for business, he decided to have the killer of Jorge Morales killed and Ray Morales took steps to determine the identity of that killer. After another person identified Kenneth Fussell as the killer of Jorge Morales, Ray Morales hired Jevon Lewis (and paid Lewis $10,000) to kill Kenneth Fussell. Jevon Lewis in turn hired Ahmed Judge and Jamar Bacon (now deceased), two members of the [Lewis DTO], to murder Kenneth Fussell. Ahmed Judge and Jamar Bacon then murdered Kenneth Fussell on October 4, 2001.
>
> [] With regard to the murder itself, Kenneth Fussell was killed at approximately 11:30 p.m. on October 4, 2001. Fussell was shot on the steps of his apartment, located at 813 Chelton Terrace, Camden, New Jersey, as he was returning to the apartment with a bag of food for his family. Fussell was shot four times as follows: one bullet passed through his right arm; another bullet grazed his shoulder; another bullet passed through the right side of his face; and one bullet entered the back right side of his head and remained lodged in his forehead.  The last bullet killed Fussell instantly.

(PSR at ¶¶ 61, 62).

3

Using the United States Sentencing Guidelines effective November 1, 2008, the United States Probation Office ("Probation") calculated Defendant's base offense level. Probation first noted the government had stated that based on "the short time frame of his involvement in the drug conspiracy . . . Judge should only be held accountable for 5 to 15 kilograms of cocaine" and "it was impossible to determine even an approximate amount that was converted to crack cocaine." (PSR at ¶ 72). Accordingly, based on drug weight his base offense level would have been a 32 absent the other counts of conviction. (Id.). However, Probation explained that this level based on the drug amount was "moot due to the Murder cross-reference." (Id.).

Probation ultimately calculated Defendant's base offense level as a level 43 based on grouping Counts One and Two "pursuant to U.S.S.G. § 3D1.2(c) because the murder charge is a cross-reference to the drug conspiracy charge." United States Sentencing Guidelines ("U.S.S.G.") § 2D1.2(c) (November 1, 2008). (ECF 498-2 at ¶ 73). Accordingly, it was Defendant's murder conviction, not the type or weight of the drugs, that determined his base offense level.

After finding no other guidelines adjustments, Probation calculated an advisory guideline range of life imprisonment plus a minimum of an additional 120 months to be served consecutively

after concluding Defendant's criminal history category was Category V and his total adjusted offense level was the same as the base – a level 43. (PSR at ¶¶ 98-105, 125, 157). At sentencing the criminal history category was corrected, and the parties agreed that it should actually be Category III based on six criminal history points. (ECF 334 at 7:3-25). The Court determined that the change in criminal history category did not have an impact on the guideline as a 43 equates to a guidelines range of life-life across all six criminal history categories. (Id. at 8:5-7).

On April 22, 2009, the Court sentenced Defendant to two terms of life imprisonment on Counts One and Two respectively, to be served concurrently. (ECF 310 at 2). He was sentenced to a term of 120 months on Count Three, to be served consecutively to Counts One and Two. (Id.). Finally, he was sentenced to a term of 120 months on Count Four, to be served concurrently with Counts One and Two. (Id.). On May 1, 2009, the Court issued an Amended Judgment, to correct a clerical issue. (ECF 313). On July 23, 2009, the Court issued another Amended Judgment, updating the amount of restitution. (ECF 331). Defendant appealed his sentence, and the Third Circuit affirmed. (ECF 369).

On August 3, 2010, the Fair Sentencing Act (the "FSA") was enacted to reduce the disparity between statutory penalties for

trafficking crack cocaine and powder cocaine.  Pub. L. No. 111-220, 124 Stat 2372 (2010).  The FSA also raised the drug quantities required to trigger certain minimum penalties pursuant to 21 U.S.C. § 841, one of the statutes under which Defendant was convicted.  See United States v. Ferrer, 859 F. App'x 648, 649 (3d Cir. 2021) ("The Fair Sentencing Act raised the drug-quantity thresholds needed to trigger certain mandatory-minimum sentences.").

In addition to the statutory changes to the Controlled Substances Act ("CSA") the FSA also had a cascading effect on the Drug Quantity Table found in the sentencing guideline section applicable to CSA offenses, U.S.S.G. § 2D1.1(c). Because the ratio between crack and powder cocaine was reduced, it required a larger amount of crack cocaine to raise any given base offense level.  For example, under the November 2011 Guidelines an amount of 8.4 kilograms of crack triggered the highest offense level of 38 whereas under the 2008 Guidelines only 4.5 kilograms of crack was required.

The FSA had no effect on the amount of powder cocaine required to trigger the various base offense levels.  This is because in order to reduce the ratio between powder and crack the amount of crack to trigger statutory penalties increased while the amount of powder remained the same.  The United States Sentencing Commission amended the Sentencing Guidelines to

6

reflect the FSA in November 2011.  As relevant to this case,
after the FSA, as before, a drug weight of powder cocaine of 5
to 15 kilograms resulted in a base offense level of 32.  Compare
U.S.S.G. § 2D1.1(c)(1) (November 1, 2008) with U.S.S.G. §
2D1.1(c)(1) (November 1, 2011).

Then in 2014, the United States Sentencing Commission
promulgated Amendment 782 which retroactively reduced by two
levels the base offense levels assigned to many drug quantities
set forth in the Drug Quantity Table of U.S.S.G. § 2D1.1(c).
United States v. Thompson, 825 F.3d 198, 202 (3d Cir. 2016).
Again, there was a cascading adjustment to the Drug Table, this
time for powder cocaine as well.  If sentenced on a standalone
drug offense after November 1, 2014, this Defendant would have
faced a base offense level of 30 instead of 32.  Compare
U.S.S.G. § 2D1.1(c)(4) and (5) (November 1, 2008) with U.S.S.G.
§ 2D1.1(c)(4) and (5) (November 1, 2014).

On December 21, 2018, Congress passed the First Step Act
("First Step Act") which, among other things, in its Section 404
made the provisions of the FSA fully retroactive.  First Step
Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018);
Concepcion v. United States, 597 U.S. 481, 488 (2022).  Section
404(a) sets out which offenses are covered by the FSA:

> (a) DEFINITION OF COVERED OFFENSE.—In this
> section, the term "covered offense" means a
> violation of a Federal criminal statute, the

7

> statutory penalties for which were modified
> by section 2 or 3 of the Fair Sentencing Act
> of 2010 (Public Law 111-220; 124 Stat.
> 2372), that was committed before August 3,
> 2010.

First Step Act, § 404(a).

Subject to limitations set forth in Section 404(c) of the

First Step Act, Section 404(b) states:

> (b) DEFENDANTS PREVIOUSLY SENTENCED.—A court
> that imposed a sentence for a covered
> offense may, on motion of the defendant, the
> Director of the Bureau of Prisons, the
> attorney for the Government, or the court,
> impose a reduced sentence as if sections 2
> and 3 of the Fair Sentencing Act of 2010
> (Public Law 111-220; 124 Stat. 2372) were in
> effect at the time the covered offense was
> committed.

First Step Act, § 404(b).

Defendant filed the instant motion seeking a reduction in

sentence based on § 404(b) on October 5, 2020.  (ECF 436).

After he was appointed counsel, Defendant filed a supplemental

motion on September 2, 2021.  (ECF 448).  The Government filed

its Response on May 5, 2023 (ECF 498) and Defendant filed a

Reply on July 20, 2023 (ECF 505).  Finally, on November 21,

2023, the Government filed another letter, advising this Court

of additional precedent.  (ECF 512).

## II.  **Legal Standard**

A court that has sentenced a defendant for a "covered

offense" prior to the enactment of the FSA may resentence a

Defendant in accordance with the FSA's penalty changes by virtue

8

of § 404(b) of the First Step Act.  See United States v. Easter, 975 F.3d 318, 323 (3d Cir. 2020) (abrogated on other grounds by Concepcion, 597 U.S. at 490 n.2) (discussing motions made under § 404(b)).  If the Court determines that a defendant is eligible for relief under § 404(b) of the First Step Act (and not excluded under § 404(c)), the Court must then also analyze such a motion under the sentencing factors set forth in 18 U.S.C. § 3553(a).  Id. at 326 ("Accordingly, we hold that when deciding whether to exercise its discretion under § 404(b) of the First Step Act to reduce a defendant's sentence, including the term of supervised release, the district court must consider all of the § 3553(a) factors to the extent they are applicable.").

A court may only consider changes in facts that go to the § 3553(a) factors that were not in play at the time of original sentencing.  United States v. Murphy, 998 F.3d 549, 555 (3d Cir. 2021), as amended (Aug. 4, 2021) (abrogated on other grounds by Concepcion, 597 U.S. at 490 n.2) ("This new assessment must include any new, relevant facts that did not exist, or could not reasonably have been known by the parties, at the time of the first sentencing (e.g., a defendant's post-sentencing rehabilitation or new health problems).").  This is because, a § 404 motion is not a license for a district court to reassess its original sentencing determinations.  Id. ("[T]he resentencing court cannot reach beyond [facts that could not have been known

9

at the original sentencing or post-sentencing developments] to reconsider the facts as they stood at the initial sentencing.").

In going about this analysis using the above standard, a sentencing court has a wide range of discretion to consider post-sentencing circumstances and "[t]he only limitations on a court's discretion to consider any relevant materials . . . in modifying that sentence are those set forth by Congress in a statute or by the Constitution." Concepcion, 597 U.S. at 494. In the case of the First Step Act, no additional limitations are in play. Id. at 497 ("Section 404(b) does not erect any additional such limitations. The term 'as if' simply enacts the First Step Act's central goal: to make retroactive the changes in the Fair Sentencing Act."). By the same token, a district court also is not required to modify a sentence even if it is empowered to do so under the First Step Act. Id. at 496 ("In fact, § 404(c) only underscores that a district court is not required to modify a sentence for any reason.").

In sum, for those who qualify for consideration of a reduction under § 404(b) the process for determining whether a defendant should receive a sentence reduction under the First Step Act contains two steps. United States v. Shields, 48 F.4th 183, 192 (3d Cir. 2022). First, "the District Court should start with the benchmark Guidelines range recalculated only to the extent it adjusts for the Fair Sentencing Act." Id. Then,

the sentencing court may consider other post-sentencing developments that warrant consideration.  Id.; Concepcion, 597 U.S. at 481 n.6. ("The district court may then consider postsentencing conduct or nonretroactive changes in selecting or rejecting an appropriate sentence, with the properly calculated Guidelines range as the benchmark.").

### III. **Analysis**

Defendant argues that this Court should grant him a reduction in his sentence based on the First Step Act.  He explains that he was convicted of a covered offense under 21 U.S.C. § 841(b)(1)(B).  (ECF 436 at 1-2; ECF 448 at 5). Defendant states that because he was convicted of a covered offense in Count One, he is therefore eligible for relief over his whole sentence, and thus the Court need not assess whether 21 U.S.C. § 848(e)(1)(A) is a covered offense, an issue that had been undecided in the Third Circuit at the time Defendant filed his Motions.  (ECF 448 at 8 fn. 2).  Defendant argued that the sentencing package doctrine applies, allowing this Court to resentence on both 21 U.S.C. § 841(b)(1)(B) and 21 U.S.C. § 848(e)(1)(A) because these sentences are "interdependent."  (ECF 505 at 5).  Defendant noted that this question was pending

before the Third Circuit at the time of briefing.  (Id. at 4 fn.
1).

The Government conceded that "Defendant's Count 1
conviction for participating in a drug trafficking conspiracy is
a 'covered offense' under the First Step Act."[1]  (ECF 498 at 1,
13).  However, the Government argued that this Court should not
apply the sentencing package doctrine, and accordingly "even if
the Court should reduce his sentence on Count 1 to a term of
years, his sentence on the remaining Counts should remain the
same."  (Id. at 21).

The Third Circuit addressed the question of whether 21
U.S.C. § 848(e)(1)(A) is a covered offense and resolved the
question of whether the sentencing package doctrine applies in
United States v. Junius, 86 F.4th 1027 (3rd Cir. 2023).  The
Third Circuit held that 21 U.S.C. § 848(e)(1)(A) is not a

_____

[1] This Court notes that the Third Circuit has held in a non-
precedential Opinion that a conviction that is based only on
powder cocaine is not eligible for relief under § 404.  United
States v. Thornton, No. 21-3322, 2022 WL 3134221, at *2 (3d Cir.
Aug. 5, 2022), cert. denied, 143 S. Ct. 629, 214 L. Ed. 2d 372
(2023).  However, as the Government has conceded eligibility
here and because Count One also alleged a conspiracy to traffic
in crack cocaine, an issue submitted to the jury, the Court
holds in these unique circumstances that Defendant is eligible
for a sentence reduction under the First Step Act even though
the drug count analysis in the PSR only addressed powder
cocaine.

covered offense and that the sentencing package doctrine does not apply under circumstances parallel to those here.

In Junis, the defendants plead guilty to both covered and not covered offenses.  Defendant Coach "pled guilty to possession with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and intentional killing in furtherance of a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848(e)(1)(A), along with other counts." Junius, 86 F.4th at 1029.  These are the same violations at issue here.  Defendant Coach was sentenced to concurrent sentences of 60 years on each charge. Id.  The Third Circuit explained that while the FSA "expressly modified penalties associated with convictions under only 21 U.S.C. §§ 841(b)(1)(A)(iii), 841(b)(1)(B)(iii), 960(b)(1)(C), and 960(b)(2)(C)" it "did not modify the statutory penalty for a § 848(e)(1)(A) violation, which remained punishable by a mandatory minimum term of imprisonment of 20 years and a maximum term of life imprisonment or a sentence of death." Id. at 1031 (emphasis in original).  The Court expanded that even though a conviction under § 848(e)(1)(A) "rests on a § 841(b)(1)(A) violation," offenses under § 848(e)(1)(A) are not covered under the First Step Act.  Id.

The Court also explained that the sentencing package doctrine[2] is inapplicable.  Id.  The Third Circuit in Junis explained that the "Court recently recognized that [w]hether two sentences are interdependent turns on whether they result in an aggregate sentence as opposed to sentences which may be treated discretely."  Id. at 1028 n.1 (quoting United States v. Norwood, 49 F.4th 189, 203 (3d Cir. 2022)) (internal quotations omitted) (alteration in original).  It thus follows that the sentencing package doctrine does not usually apply to sentences grouped together under the Sentencing Guidelines or to concurrent sentences."  Id.  Applying this to the circumstances in Junis, the Third Circuit explained that the sentences imposed "for murder in furtherance of a continuing criminal enterprise were imposed independently from their cocaine base distribution charges.  So they were not part of a sentencing package."  Id. In addition, the sentences imposed were to run concurrently, further demonstrating that the sentences "could be treated

---

[2] "The sentencing package doctrine suggests that when a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an overall plan.  When a conviction on one or more of the component counts is vacated, common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture upon remand, within the applicable constitutional and statutory limits, if that appears necessary in order to ensure that the punishment still fits both crime and criminal."  United States v. Davis, 112 F.3d 118, 122 (3d Cir. 1997).

discretely" and therefore "the sentencing package doctrine does not apply." Id.

The Third Circuit concluded that "[a]s murder in furtherance of a CCE is not a 'covered offense' under the First Step Act, and since the sentencing package doctrine is inapplicable to the facts of this case, the District Court was correct to conclude that [Defendants] were each ineligible for sentence reductions." Id. at 1031.

Like Defendant Coach in Junis, Judge was convicted under § 841(b)(1)(A) and § 848(e)(1)(A).  While his § 848(e)(1)(A) conviction necessarily relies on his § 841(b)(1)(A) conviction, the sentencing Judge, Judge Irenas, imposed separate sentences, imposing a life sentence for each to run concurrently. Therefore, Judge, like the defendants in Junis, is ineligible for a sentence reduction on his overall sentence as his life sentence under Count Two, his concurrent 120 month sentence under Count Four, and his consecutive 120 month sentence under Count Three may not be reviewed under the First Step Act.

This Court, Junis notwithstanding, may, within its discretion, reduce the specific sentence imposed on the § 841(b)(1)(A) Count, although it will have no effect on his life sentence under § 848(e)(1)(A).  Junis, 86 F.4th at 1029, n. 3 (district court acted within its discretion to consider reducing defendant's drug offense sentence").  The Court will therefore

15

assess the § 3553(a) factors to determine whether to impose a reduced sentence solely on the conviction under § 841(b)(1)(A).

While the Court must consider "any new, relevant facts that did not exist . . . at the time of the first sentencing," this Court is not free to reweigh the factors in play at the time of the original sentencing. Murphy, 998 F.3d at 555. Accordingly, except to the extent they serve as contrast, in assessing the § 3553(a) factors this Court will consider the post-sentencing facts set forth by the parties in their briefing as compared to the facts found by Judge Irenas at the original sentencing. Stated differently, this Court will not reassess the facts considered by Judge Irenas in his original sentence.

The nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), are unchanged. The main circumstance of the offense that Judge Irenas focused on was that this drug conspiracy included a murder for hire committed by Defendant. (ECF 334 at 68:16–69:18). This Court further notes the circumstances of this killing. Defendant participated in killing the victim after he was hired by codefendant Lewis to do so. (Id. at 47:21–48:7). Although co-defendant Morales had identified the victim as having interfered with the drug conspiracy and wanted him murdered, it was later confirmed that the victim was

16

incorrectly identified, making the murder that much more shocking and senseless. (Id. at 47:21-48:25).

The history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), require the most significant update. At the initial sentencing, Judge Irenas noted that Defendant had a "rough upbringing," but expressed that most people with rough upbringings do not go on to commit crimes, including murder and drug dealing. (ECF 334 at 65:16-66:2). In addition, at the time of sentencing the Court was aware of Defendant's criminal history, including a conviction for manslaughter. (PSR at ¶ 125).

It does appear that this factor has changed since Defendant's original sentencing in 2009. Defendant acknowledges that at the time he committed the underlying offenses he did not have a sense of purpose. However, "I have purpose now, which is mainly my daughter & my family who have been by my side threw [sic] this adventure." (ECF 436 at 5). He also points to his work history, stating that he likes to work and has "held a job at UNICOR for 6 years," working on sewing machines. (Id.). He attests that he has participated in the STOP the Violence Program in the prison as one of the first members. (Id.). He has "completed numerous educational and technical training courses covering topics such as computer applications and keyboarding, violence prevention, health and wellness,

parenting, and money management." (ECF 448 at 19). He also participates in the Inmate Financial Responsibility Program. (Id.).

The Defendant's post-incarceration record is not all positive, however. In Defendant's initial motion he stated that he has had only three infractions while incarcerated. (ECF 436 at 5). His supplemental motion corrects this record, explaining that he has sustained eight disciplinary infractions while incarcerated for this instant case. (ECF 448 at 19). He downplays these infractions by explaining that "[m]ore than at half of those have been for non-violent infractions." (Id.). However, he concedes that he has "sustained three serious infractions for assault without serious injury and threatening bodily harm (arising from the same incident on July 2, 2012) and fighting (February 2020)." (Id.). Finally, Defendant states that he has had a clear disciplinary record since April 2020. (Id.). This statement is made in a brief filed in September 2021 and based on a report from August 2021.

In his Reply filed in July 2023, Defendant updates this information and states that he "has not incurred a new disciplinary infraction in more than three years." (ECF 505 at 6). This Court is troubled by the violent infractions included in his incarceration history as recently as 2020. That said,

18

the Court also commends Defendant's most recent period of three years without an infraction.

Defendant argues that despite his criminal history, he has since "broken negative ties with the people he associated with in the course of his offense." (Id.). Further, "he has maintained and developed incredibly strong relationships with his family, friends, and community." (Id.). In support of this averment, Defendant has provided numerous letters of support from family and community members. (ECF 448-3 at 1–9; 505-1 at 1–4). While the support the Defendant enjoys is encouraging, on balance his numerous disciplinary infractions over an extended period render this factor only slightly in Defendant's favor.

In considering the need for the sentence imposed to reflect the seriousness of the offense, 18 U.S.C. § 3553(a)(2)(A), Judge Irenas focused on the fact that there was a murder "clearly in furtherance of the [drug] conspiracy." (ECF 334 at 68:18–19). He explained that "[t]his is a drug conspiracy, where it was one thing to be a bodyguard, if you don't actually shoot anybody, but it's another thing to actually perceive your role within a conspiracy as committing murder." (Id. at 69:8–11). He stated that while he would be unlikely to issue a life sentence for a drug conspiracy without murder involved, the circumstance of the murder as part of the drug conspiracy justifies a life sentence on the drug conspiracy count. (Id. at 68:24–69:18). In light

of the constancy of the grouping rules, this factor is unchanged from the original sentencing.

Assessing the need for just punishment, 18 U.S.C. § 3553(a)(2)(A), Judge Irenas explained that with the seriousness of the offense, just punishment becomes a more substantial factor.  (ECF 334 at 62:15-22) ("There are crimes that sometimes get, you know, so serious that a very large punishment is required just to satisfy society's sense that you simply can't get away with that, and punishment for its own sake is appropriate.").  Defendant argues that "'the 'need for just punishment' has dramatically shifted since sentencing,'" as lockdown procedures undergone to mitigate the spread of COVID-19 have made confinement more punitive than it was at the time of Defendant's sentencing.  (ECF 448 at 15 (citation omitted)).

The Government responds that "Judge, however, has not alleged anything unique about his experience or his health which would support a reduction."  (ECF 498 at 16).  While this Court recognizes the particular difficulties that people who are incarcerated have experienced with respect to COVID-19, this does not alter the appropriateness of a punitive sentence in circumstances such as here.  See United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, . . . But the mere existence of COVID-19 in society and the possibility that

20

it may spread to a particular prison alone cannot independently justify compassionate release"). The presence of COVID in federal prisons, while regrettable, is an insufficient justification alone for a reduction of this Defendant's sentence given the seriousness of the offense.

In examining the need for the sentence imposed to afford adequate deterrence, 18 U.S.C. § 3553(a)(2)(B), Judge Irenas stated that in expressing that the Defendant saw the error in his ways, "I think Mr. Judge told me what's in [his] heart, I think he was telling me that. But I have to look at the entire record here, when I turn to specific deterrence." (ECF 334 at 63:17-20). Judge Irenas noted the young age that Defendant began engaging in criminal activity; noted multiple instances of escape, attempted escape, or attempted flight while incarcerated or during arrest; and noted a lack of respect for the law including a laundry list of institutional infractions. (Id. at 63:21-65:13). Judge Irenas concluded that based on these factors there was a need for specific deterrence, as he was not confident "he won't revert to what he's done before." (Id. at 65:11-13).

Defendant avers that "[r]esearch studies consistently confirm that it is the certainty, rather than the severity of punishment that serves as a deterrent." (ECF 448 at 14). While this Court acknowledges that research, it also must acknowledge

Defendant's history of escalating offenses, and that he had
previously been convicted of manslaughter and served a term of
incarceration related to the offense.  (PSR at ¶¶ 116-119).  The
certainty of that punishment did not deter him from engaging in
the premeditated murder for hire that is part of his conviction
in the drug conspiracy here.  This factor is at best neutral.

Assessing the need for the sentence imposed to protect the
public, 18 U.S.C. § 3553(a)(2)(C), Defendant argues that his
"likelihood of recidivism diminishes with each passing month,"
as research shows that likelihood of recidivism declines as
defendants age.  (ECF 448 at 17).  The Government responds that
"[v]iolent offenders recidivated at a higher rate than non-
violent offenders in every age group at the time of release from
prison."  (ECF 498 at 15 (citation omitted)).  The Court notes
that Defendant falls into the violent offenders category.
Therefore, the risk of recidivism remains substantial despite
his age and the progress Defendant has made rendering this
factor also neutral.

Looking at the sentencing range, 18 U.S.C. § 3553(a)(4),
this Court notes that the guideline range for the drug count has
changed only modestly, despite the change in law, and not as a
result of the FSA, the predicate consideration under § 404 of
the First Step Act.  Rather the reduction in base offense level

was caused by a later broad change in the guidelines.[3]  In

considering the guideline sentence at the time of the initial

---

[3] As noted above, for those who qualify for consideration of a
reduction under § 404(b) the process under the First Step Act
contains two steps.  United States v. Shields, 48 F.4th 183, 192
(3d Cir. 2022).  First, "the District Court should start with
the benchmark Guidelines range recalculated only to the extent
it adjusts for the Fair Sentencing Act."  Id.  Then, the
sentencing court may consider other post-sentencing developments
that warrant consideration.  Id.; Concepcion, 597 U.S. at 481
n.6. ("The district court may then consider postsentencing
conduct or nonretroactive changes in selecting or rejecting an
appropriate sentence, with the properly calculated Guidelines
range as the benchmark.").  Here, since Defendant's drug offense
only took powder cocaine into consideration the FSA did not
lower his guideline range.  In that sense, Defendant is not one
of those sentenced defendants Congress sought to benefit from a
retroactive application of the FSA.  Concepcion, 597 U.S. at
494, 497 ("the First Step Act's central goal [was] to make
retroactive the changes in the Fair Sentencing Act.").  Rather
Judge's base offense level today would be two points lower than
it was at his original sentencing as a consequence of the later
reform of "Drugs minus 2" reflected in the Sentencing
Commission's 2014 Amendment 782.  Even accounting for that
change, if Defendant had been convicted of only Count One and no
other crimes, and the underlying facts remained the same, his
adjusted offense level under Count One would still have been
high and the resulting advisory guidelines range substantial.
Probation's conclusion that "Judge should only be held
accountable for 5 to 15 kilograms of cocaine" and "it was
impossible to determine even an approximate amount that was
converted to crack cocaine," would warrant a base level 30 under
existing law. U.S.S.G. § 2D1.1(c)(5).  He would then have
received points, then and now, for possession of a firearm, §
2D1.1(b)(1)(+2), and use of violence, § 2D1.1(b)(2)(+2), making
the adjusted offense level 34.  Under the current guidelines,
with an offense level of 34 and criminal history category III,
the guideline range would be 188-235 months.  While it is true
that the points for possession of a firearm and use of violence
would fall away as double counting in light of the convictions
on Counts Two and Three, Defendant's base offense level for
Count One would still have an advisory range of 151-188 months.
While this Court recognizes that these ranges are well below the
life sentence imposed for Count One here, they are only modestly

sentencing, Judge Irenas stated after applying the grouping rules, "the fact that the offense ranks at the very top of serious offenses, I really can't find a rational basis for saying that the guidelines got it wrong." (ECF 334 at 67:7-10). As noted those same grouping rules apply today, making Defendant's advisory guideline range the same today as it was at his original sentencing.

Considering the need to avoid unwarranted sentence disparities, 18 U.S.C. § 3553(a)(6), Defendant expresses his position that it is not "fair that the only reason the Government insist [he] shouldn't be released is because [he] didn't cooperate with them." (ECF 436 at 3). He states that if Raymond Morales, a cooperating witness and co-defendant in his

---

below what the guidelines would have been for a standalone drug offense at the original sentencing. What remains immutable is that Defendant participated in a murder in furtherance of a drug conspiracy. The grouping rules reflect the severity of this fact.

    To be clear, the Court recognizes that the Sentencing Guidelines, including the grouping rules, are advisory and that this Court has the authority to resentence the Defendant consistent with a level 34 and below, all the way down to the statutory floor on Count One alone and further that a sentence to a term of years is materially different than a sentence of life. This Court's analysis of the various calculations set forth is meant to show not that the Court lacks the authority under the First Step Act to lower Defendant's sentence on Count One, only that there is insufficient change in the record of this case, given the severity and scope of Defendant's drug trafficking and the violent efforts taken to protect it, and the applicable law to justify that result when the case is viewed a whole.

case, can be released when he admitted to murders, then Defendant should be released too.  (Id.).  In his supplemental motion, Defendant also argues "[a] reduction to a term of years sentence would result in no disparity.  Indeed, the average sentence for a federal defendant convicted of murder is 255 months."  (ECF 448 at 16).  Neither of these points fully encapsulates the need to avoid unwarranted sentencing disparities.

First, while Defendant objects to the significance of the distinction between himself and Morales, assuming that Morales did cooperate and received a lesser sentence because of it, this would make Defendant's circumstances fundamentally distinct from his.  Moreover, Judge Irenas addressed a distinction between Judge and Morales at sentencing: "I don't think it's fair to me to say that if I give a different sentence to Mr. Morales than I give to someone who goes to trial, then I'm giving disparate sentences.  I'm not giving disparate sentences, I'm giving sentences that reflect choices that those people made, as what they were going to do with their life, at that -- from that point forward."  (ECF 334 at 60:8-14).  He concluded that it is not comparable.  (Id. at 60:20-21).  Title 18, 18 U.S.C. § 3553(a)(6), does not preclude disparity, only disparity that is "unwarranted."  A guideline range reduced after the granting of

a departure motion under U.S.S.G. § 5K1.1 is fully warranted by the Guidelines themselves.

Second, while not irrelevant, noting the average sentence for murder does not factor in all of the circumstances of this Defendant's offenses and the other § 3553(a) considerations. here. Determining sentencing disparity requires comparison of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Comparing Defendant's sentence to the average sentence for the generic crime of murder is not particularly useful when Defendant's crime is the commission of murder in furtherance of a substantial drug trafficking organization. For those defendants convicted in federal court, their base offense level is 43 with a sentencing range of life-life regardless of their criminal history category. In that sense, Defendant's sentence is consistent with the generic offense not above it.

The § 3553(a) factors also include the need to provide restitution to any victims of the offense, 18 U.S.C. § 3553(a)(7). Defendant asks this Court to relieve him of his continued restitution obligation. (ECF 436 at 3). He states that he has paid $4,127 of the $6,500 restitution amount, and that he should only have been required to pay one third of the $6,500, as codefendants Lewis and Morales were also obligated to

pay.  (Id.).  He states that this burdens his ability to send
money to his own family.  (Id. at 4).

    While perhaps in an ideal circumstance each codefendant
responsible for restitution would pay in equal amounts, this is
not how this part of his sentence functions.  Rather, the
portion of the judgment setting out the restitution obligation
states that "[t]he amount ordered represents the total amount
due to the victim for this loss.  The defendant's restitution
obligation shall not be affected by any restitution payments
made by other defendants in this case, except that no further
payments shall be required after the sum of the amounts actually
paid by all defendants has fully satisfied this loss," which
accounts for the joint and several nature of the restitution.
(ECF 331 at 5) (emphasis added).  To treat the restitution
obligation as only partially due from each defendant in some
proportional share runs the risk the victim will not be made
whole if even one defendant is unable to pay their allotted
amount.  This Court notes that the restitution here is premised
on expenses related to the loss of a human life.  This Court
will not relieve Defendant of his obligation to continue to pay
until the full loss amount is realized.  Defendant was equally

responsible for the murder in this case and should be equally obligated to pay the full restitution.

Overall, the Court concludes that the § 3553(a) factors do not weigh in favor of a reduced sentence.  This Court commends Defendant's involvement in prison programing and his commitment to his family.  That said, these positives at this time do not overcome the significant seriousness of Defendant's offense, his character leading up to his conviction and since, the need for general and specific deterrence, and the need to protect the public, especially where Defendant's guideline range remains unchanged from the range Judge Irenas considered at the original sentencing.

## IV.  <u>Conclusion</u>

For the reasons set forth above, Defendant's Motion for Reduction of Sentence (ECF 436) and Supplemental Motion for Reduction of Sentence (ECF 448) will be denied.

An accompanying Order will issue.


Date: February 14, 2024          s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.

28